## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL WILLIAMS, Derivatively on Behalf of VANDA PHARMACEUTICALS INC., | Case No. _____ |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| MIHAEL H. POLYMEROPOULOS, JAMES P. KELLY, GIAN PIERO REVERBERI, H. THOMAS WATKINS, MICHAEL F. COLA, KENNETH M. BATE, RICHARD W. DUGAN, VINCENT J. MILANO, and HOWARD H. PIEN, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendants, | |
| -and- | |
| VANDA PHARMACEUTICALS INC., | |
| Nominal Defendant. | |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Samuel Williams ("Plaintiff"), by and through his undersigned attorneys, brings this action derivatively on behalf of Vanda Pharmaceuticals Inc. ("Vanda" or the "Company"), and alleges the following on information and belief, except as to those allegations pertaining to his own knowledge and conduct, which are made upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation:  (a) review and analysis of public filings in *United States of America, ex rel. Richard Gardner v. Vanda Pharmaceuticals*, Case No. 1:17-cv-00464-APM (D.D.C.) (the "Qui Tam Lawsuit"); (b) review and analysis of public filings in *Gardner v. Vanda Pharmaceuticals Inc.,* No. 1:19-cv-01108-ARR-LB (E.D.N.Y.) (the "Securities Class Action"); (c) review and analysis of regulatory filings made by Vanda, with the United States Securities and Exchange Commission (the "SEC"); (d) review and

analysis of press releases and media reports issued and disseminated by Vanda; and (e) review of other publicly available information concerning Vanda.

## I.    INTRODUCTION

1.      This is a shareholder derivative action brought on behalf of Vanda against certain of its officers and directors seeking to remedy the intentional or reckless breaches of their fiduciary duty, waste of corporate assets and unjust enrichment that caused and continue to cause substantial harm to the Company beginning in 2015. This misconduct resulted in millions of dollars in damages to Vanda's reputation, goodwill, and standing in the business community, and exposed the Company to millions more for potential liability for violations of state and federal laws.

2.      Vanda is a biopharmaceutical company that focuses on the development and commercialization of products for the treatment of central nervous system disorders. Vanda owns and markets two drugs: (i) Fanapt® (iloperidone), for the treatment of schizophrenia ("Fanapt"), and (ii) HETLIOZ® (tasimelteon), a drug for the treatment of Non-24-Hour Sleep-Wake Disorder ("Hetlioz").

3.      Since at least November 2015, the Company schemed to promote its drugs Fanapt and Hetlioz for "off-label"[1] uses, in addition to employing several other prohibited promotional strategies. Specifically, the Company: (1) promoted Fanapt for uses outside of treating schizophrenia, the drug's sole approved indication; (2) promoted Fanapt off-label to pediatric patients; (3) overstated Fanapt's efficacy to doctors, hospitals, pharmacies and other providers (collectively referred to as "providers"); (4) downplayed the safety risks associated with Fanapt; (5) misled providers about Fanapt's approved dosing schedule; (6) improperly provided titration packets which were in violation of the FDA-approved titration schedule and did not have adequate instructions for use; (7) promoted Fanapt as a first line therapy; (8) misused Fanapt copay cards; and (9) promoted Hetlioz for off-label uses.

---

[1] "Off-label" use is the use of pharmaceutical drugs for an indication, or in an age group, dosage, or route of administration, that has not been approved by the FDA.

4.      Federal health care programs, including Medicare, Medicaid and Tricare provided reimbursement for these unauthorized prescriptions in violation of the Federal False Claim Act, 31 U.S.C. § 3729, state false claim acts, the United States Food, Drug and Cosmetic Act (the "FDCA"), and applicable regulatory and ethical guidance.

5.      As a result of Defendants' misconduct, Vanda is facing significant liability from a Qui Tam Lawsuit filed by Relator on behalf of the United States of America, the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Washington, the Commonwealth of Massachusetts, Virginia, the District of Columbia, and the policyholders of XYZ Nos. 1-10 Insurance Companies. Vanda has incurred substantial expenses relating to the investigation of the abovementioned misconduct and wrongdoing including legal fees and expenses, the potential for compensation to individual States, insurance companies, and regulatory fines and penalties.

6.      The Qui Tam Lawsuit alleges that the Company`s executives and officers, including Vanda's President and Chief Executive Officer, Mihael H. Polymeropoulos ("Polymeropoulos"), and Senior Vice President Gian Piero Reverberi ("Reverberi"), knew about and participated in the wrongdoing and actively participated in the fraudulent scheme. By consciously and reckless disregarding their fiduciary duty of care and loyalty, the Individual Defendants have brought consequential harm to Vanda.

7.      Further, the Individual Defendants caused the Company to issue materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.

8.      Specifically, the Company failed to disclose to investors that: (1) Vanda was engaged in a fraudulent scheme to promote the off-label use of Fanapt and Hetlioz; (2) Vanda defrauded the government by violating Medicare, Medicaid, and Tricare programs; (3) as a result of the scheme, Vanda faced a Qui Tam Lawsuit; (4) Vanda's promotional materials for Fanapt and Hetlioz were false and misleading, garnering regulatory scrutiny from the FDA; and (5) as a result, Defendants'

statements about Vanda's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.      As a direct result of Defendants' unlawful conduct, the Company is now a Defendant in a Securities Class Action filed in the United Stated District Court for the Eastern District of New York.

10.      Because of the Officer Defendants' misconduct, Vanda sustained damages, including, but not limited to, costs and expenses incurred in connection with the legal action taken against the Company.

11.      The Board completely failed in its duty of care and oversight in the face of these serious violations of federal and state laws and regulations. The sustained failure of the Board to ensure effective corporate governance and ensure compliance was the result of the Director Defendants' knowing breach or reckless disregard for their fiduciary duties.  The Board was inattentive and consciously turned a blind eye to the fraudulent promotion scheme, and abuse of government healthcare programs, resulting in violations of the Federal False Claim Act, state false claim acts, the FDCA, and federal securities laws. Through these failures, the Director Defendants breached their fiduciary duty to Vanda and its shareholders.

12.      For these reasons and as set forth in greater detail herein, Plaintiff seeks needed corporate governance, management policy and procedural changes, which are necessary to ensure that the Company complies with federal and state laws and regulations. Plaintiff, on behalf of Vanda, also seeks monetary damages from the Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by Vanda and its shareholders.

## II.   JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

14.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the Company conducts business in this District. Further, Vanda engages in numerous activities and conducts business here, which had an effect in this District.

## III.   PARTIES

17.     Plaintiff is a current shareholder of Vanda and has continually held Vanda stock at all relevant times.

18.     Nominal Defendant Vanda is incorporated in Delaware and maintains its headquarters at 2200 Pennsylvania Avenue NW, Washington D.C. 20037. Vanda is a global biopharmaceutical company that focuses on the development and commercialization of products for the treatment of central nervous system disorders. Vanda sells, markets, and promotes its products throughout the United States, including New York. Vanda's common stock is publicly traded on NASDAQ under the symbol "VNDA."

19.     Defendant Polymeropoulos has served as Vanda's President, Chief Executive Officer ("CEO") and a director since May 2003.

20.     Defendant H. Thomas Watkins ("Watkins") has served as Chairman of the Board since March 2014 and has been a member of the Board since 2006. Defendant Watkins serves as the Chairman of the Nominating/Corporate Governance Committee and as a member of the Compensation Committee.

21.     Defendant Michael F. Cola ("Cola") has been a director of the Company since 2012. Defendant Cola serves on the Audit Committee and Compensation Committee.

22.     Defendant Kenneth M. Bate ("Bate") served as a director of the Company from December 2015 until June 2018. Defendant Bate did not stand for re-election when his term expires on June 13, 2018 at the Annual Meeting. Defendant Bate served on the Compensation Committee.

23.     Defendant Richard W. Dugan ("Dugan") has been a director of the Company since 2005. Defendant Dugan serves as the Chairman of the Audit Committee and as a member of the Nominating/Corporate Governance Committee.

24.     Defendant Vincent J. Milano ("Milano") served as a director of the Company from 2010 until June 2019. Defendant Milano served as the Chairman of the Compensation Committee and as a member of the Audit Committee. Defendant Milano resigned from the Board effective at the June 13 Annual Meeting.

25.     Defendant Howard H. Pien ("Pien") served as a director of the Company from 2007 until June 2016. He also served as Chairman of the Board from December 2010 until March 2014. Defendant Pien did not stand for re-election when his term expired on June 16, 2016 following the Annual Meeting. Pien served on the Compensation Committee and was succeeded by Defendant Bate upon the expiration of his term on June 16, 2016.

26.     Defendant James P. Kelly ("Kelly") has served as Vanda's Executive Vice President, Chief Financial Officer and Treasurer since February 2017 and as Vanda's Secretary since April 2018. Previously, Defendant Kelly served as Vanda's Senior Vice President, Chief Financial Officer and

Treasurer from December 2010 through February 2017 and Secretary from December 2010 to September 2015.

27.      Defendant Reverberi has served as Vanda's Senior Vice President, Chief Commercial Officer since April 2016 and served as Vanda's Senior Vice President, Acting Chief Commercial Officer and European General Manager from December 2015 to April 2016. Defendant Reverberi was previously Vanda's Senior Vice President and European General Manager from September 2015 to December 2015.

28.      Defendants identified in paragraphs 19 through 28 are collectively referred to herein as the "Individual Defendants".

29.      Defendants Polymeropoulos, Watkins, Cola, Bate, Dugan, Milano and Pien are collectively referred to herein as the "Director Defendants."

30.      Defendants Polymeropoulos, Kelly, and Reverberi are collectively referred to herein as the "Officer Defendants"

### IV.      THE FIDUCIARY DUTIES OF VANDA'S OFFICERS AND DIRECTORS

31.      Each officer and director of Vanda owed the Company and its shareholders the duty to exercise a high degree of care, loyalty, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct complained of herein involves fraudulent misconduct by Vanda's directors and officers – a knowing, intentional, and culpable violation of the directors' and officers' obligations as directors and/or officers of Vanda, and the absence of good faith on their part concerning their duties to the Company and its shareholders. The officers' misconduct has been ratified by the Board, which has failed to take any legal action on behalf of the Company against them.

32.      By reason of their positions as officers, directors, and/or fiduciaries of Vanda, and, because of their ability to control the business and corporate affairs of Vanda, the Individual Defendants owe Vanda and its shareholders fiduciary obligations of good faith, loyalty, and candor. The Individual Defendants were and are required to use their utmost ability to control and manage

Vanda in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Vanda and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Vanda and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.    To fulfill their responsibilities and duties, the directors and officers of Vanda must supervise and manage Vanda's policies, controls, and compliance with applicable controlling statutes. Vanda's directors are each made aware of their duties and responsibilities when, as new Board members, they are required to undergo training and education on fiduciary obligations.

34.    In addition to these fiduciary duties, the directors' and officers' oversight and management obligations require them to know of and oversee compliance with various laws and regulations that apply to Vanda's business. As a pharmaceutical company, Vanda is subject to extensive regulation and regulatory oversight from both the federal government and each of the States that it operates within.

35.    Vanda's pharmaceutical business is heavily regulated. The FDCA empowers the FDA to regulate the manufacture, sale, and distribution of drugs and devices in the United States. This authority includes oversight of promotional labeling and advertising for prescription drugs and restricted devices. 21 U.S.C. § 502. Vanda is required to cooperate with the FDA and operate in accordance with the statutory requirements of the FDCA.

36.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vanda, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Vanda, each Individual Defendant had knowledge of material non-public information about the financial condition, operations, and future business prospects of Vanda.

37.    To discharge their duties, the officers and directors of Vanda were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the

Company.  By virtue of such duties, the officers and directors of Vanda were required to, among other things:

a)  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner to make it possible to provide the highest quality performance of their business;

b)  Exercise good faith to ensure that the Company operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

c)  Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

d)  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

e)  Exercise its claw back authority to claw back compensation from the directors and officers responsible for the above improprieties.

38.     As directors and officers, the Individual Defendants are subject to the Company's Code of Business Conduct and Ethics. The Code provides:

### 4. COMPLIANCE WITH APPLICABLE LAWS, RULES AND REGULATIONS

Obeying the law, both in letter and spirit, is the foundation on which the Company's ethical standards are built. **You must comply with all applicable laws, rules and regulations of the cities, states, provinces and countries in which we operate.** Although you are not expected to know the details of these laws, it is important to know enough to determine when to seek advice from managers or other appropriate personnel. If a law conflicts with a policy in the Code, you must comply with the law. If you have any questions about these conflicts, ask your manager or the Company's Compliance Officer how to handle the situation.

### 5. ETHICAL CONDUCT

**Beyond compliance with laws, the Company requires that all its employees, officers, and directors act in a manner that meets the highest standards of ethical behavior.**

\* \* \*

19. HEALTHCARE COMPLIANCE MATTERS

The Company is subject to a number of federal and state healthcare laws that are intended to, among other things, protect the health and well-being of patients that may be candidates for the Company's products. To ensure compliance with these laws, the Company has developed a Corporate Compliance Program, which consists of a series of policies and procedures. You are required to review and comply with these policies and procedures as they relate to your responsibilities within the company and to report any behaviors that may indicate non-compliance with such laws and/or the Company's Corporate Compliance Program. Copies of all Company policies and procedures are available on the Company intranet website.

(a)     Interactions with Health Care Professionals. The federal Anti-Kickback Statute prohibits the offering of anything of value that is intended to influence a person to recommend, prescribe or purchase a product (including prescription medication) that may be reimbursed by the government (e.g., Medicare or Medicaid). The Company is committed to complying with these laws. Certain interactions with health care professionals and programs offered by the Company, including but not limited to speaker programs, consulting arrangements, and support for scientific and educational activities, need to be reviewed to ensure compliance with these laws. The Company's Corporate Compliance Program is consistent with the Code on Interactions with Healthcare Professionals adopted by the Pharmaceutical Research Manufacturers of America (PhRMA Code) and the Office of Inspector General's Compliance Program for Pharmaceutical Manufacturers (OIG Guidelines). If you are involved in commercial activities on behalf of the Company, you must comply with all Company policies and procedures with respect to interactions with health care providers.

(b)     Product Information and Marketing. **The Company is committed to facilitating the safe, effective, and knowledgeable use of our products consistent with the approved prescribing information, and to providing truthful, non-misleading information to physicians and patients that is supported by scientific evidence. We are also committed to abiding by the laws and regulations that apply to advertising and promotion of our products, including rules of the FDA and other regulatory authorities. If you are engaged in sales and marketing activities, you must comply with all Company policies and procedures with respect to promotional activities.**

(c)     Product Complaints and Adverse Events. **Any employee, officer or director that becomes aware of a product complaint or adverse reaction to a Company product is required to report the information immediately to the Company's Chief Medical Officer in accordance with Company policy.**

\* \* \*

(e)     **The False Claims Act. In cases of reimbursement for pharmaceutical products under a federal health care program, such as Medicare**

**and Medicaid, the federal government considers the promotion of an unapproved drug or an unapproved use of an approved drug to be a false claim against the government and unlawful. Similarly, the provision of a kickback in connection with the promotion of the product is a violation of the False Claims Act. If you are engaged in sales and marketing activities, you must comply with all Company policies and procedures with respect to promotional activities.**

20. REPORTING ILLEGAL OR UNETHICAL BEHAVIOR

    (a)    You are encouraged to talk to supervisors or members of management about observed illegal or unethical behavior or when in doubt about the best course of action in a particular situation. If you report illegal or unethical behavior to a supervisor or a member of management, the individual receiving the complaint has an affirmative duty to report that information to the Company's Compliance Officer (or the Chief Executive Officer if the complaint relates to the Compliance Officer). It is the policy of the Company not to allow retaliation for reports of misconduct by others made in good faith by employees. You are expected to cooperate in internal investigations of misconduct.

\*    \*    \*

21. PERSONAL RESPONSIBILITY AND COMPLIANCE PROCEDURES

\*    \*    \*

    (b)    The Compliance Officer or such other person as is designated by the Company's Board of Directors shall be responsible for ensuring that the Code becomes an integral part of the Company's culture (the "Ethics Manager"). The Company shall ensure that all employees have access to the Code on the Company's internal website and shall provide each employee with a hard copy of the Code upon request. The Company will take such actions as it deems necessary to promote high standards of ethical conduct and to instruct employees regarding improper or illegal conduct. The Company shall maintain a record of all incidents reported as violations of this Code, and the Ethics Manager shall provide the Board of Directors on at least a quarterly basis a report summarizing all communications expressing complaints or concerns received and all actions taken by the Company in response thereto.

\*    \*    \*

    (e)    **The Ethics Manager together with the Company's Compliance Committee shall be responsible for implementing the appropriate disciplinary action in accordance with the Company's policies and procedures for any employee who is found to have violated the Code. The Chairman of the Board of Directors shall be responsible for implementing the appropriate disciplinary action for any officer or director who is found to have violated the Code.** The Ethics Manager shall ensure that the disciplinary mechanisms described in this section shall be subject to annual review by the Board of Directors. In addition to imposing discipline upon persons involved in non-compliant conduct, the Company also shall impose discipline, as appropriate, upon individuals who fail to detect non-compliant conduct and upon individuals who fail to report known non-compliant conduct. Disciplinary action may include the termination of the employee's employment. Disciplinary action shall be documented, as appropriate.

(f)     **In the event of a violation of the Code, the Ethics Manager or the Chairman of the Board of Directors, as applicable, should assess the situation to determine whether the violation demonstrates a problem that requires remedial action as to Company policies and procedures. Such remedial action may include retraining Company employees, modifying Company policies and procedures, improving monitoring of compliance under existing procedures and other action necessary to detect similar non-compliant conduct and prevent it from occurring in the future**. Such corrective action shall be documented, as appropriate.

(Emphasis added).

39.     Vanda's directors, officers and employees are also subject to the Comprehensive Compliance Program. The Program provides that:

Overview of Vanda's Compliance Program

2.      Leadership and Structure
Compliance Officer
Vanda has appointed a Chief Compliance Officer ("Compliance Officer") who is responsible for the operation and oversight of the Company's Compliance Program. **The Compliance Officer's responsibilities include, among other things, developing policies and procedures, training employees on the Compliance Program, addressing allegations of non-compliance, and implementing appropriate remedial measures where applicable. As appropriate, the Compliance Officer reports compliance-related issues directly to the Chief Executive Officer and/or the Board of Directors**.
Compliance Committee
Vanda has organized a Compliance Committee that consists of the Vanda senior management team. The Compliance Committee meets regularly to advise and assist the Compliance Officer in the administration of the Compliance Program.

3.      Education and Training
Vanda's directors, officers, and employees are expected to comply with the Compliance Program, the Code of Business Conduct, and all written policies and procedures. A central aspect of the Company's Compliance Program is educating and training employees on their legal and ethical obligations under applicable laws, regulations, and Company policies. All new employees must complete initial compliance training as part of new hire orientation, and additional compliance training as new developments in applicable laws, regulations, or policies and procedures arise.

4.      Internal Lines of Communication
**Employees are responsible for ensuring that Vanda's policies and procedures are met. This obligation requires that employees (1) seek compliance guidance when unclear about an ethical situation or specific conduct, and (2) report possible violations of laws, regulations, or Company policies.** Vanda's policies provide for confidential reporting of allegations of misconduct and protections against retaliation

for such reporting. Employees should contact their supervisor, the Compliance Officer, Senior Management, or Human Resources regarding questions about the Compliance Program or to report potential violations. Employees may also report potential violations anonymously. The Company has set up a compliance hotline number that can be used for these anonymous reports.

     5.     Auditing and Monitoring

**Vanda's Compliance Program includes efforts to audit, monitor, and evaluate compliance with the Company's compliance policies and procedures.** The nature, extent, and frequency of compliance monitoring and auditing varies according to a variety of factors, including new regulatory requirements, changes in business practices, and other considerations.

     6.     Disciplinary Standards

Adherence to the Company's Code of Business Conduct and policies and procedures is a condition of employment at Vanda. **The Company investigates potential violations of law or Company policy and, where appropriate, implements corrective measures to prevent, detect and deter future violations. Any violation of these requirements by directors, officers, or employees is subject to disciplinary action up to an including termination.**

     7.     Responding to Potential Violations

A Compliance Program designed in accordance with the OIG Guidance is intended to increase the likelihood of preventing, or at least detecting, unlawful and unethical behavior. Even an effective Compliance Program, however, may not prevent all violations. **As such, Vanda investigates potential violations of law or Company policy and, where appropriate, implements corrective measures to prevent, detect and deter future violations.**

(Emphasis added).

40.     As Chairman and a member of the Nominating/Corporate Governance Committee, Defendants Watkins and Dugan were required to comply with the Nominating/Corporate Governance Committee Charter that was in place at the time of the alleged wrongdoing. The Charter provides that each director serving on the Nominating/Corporate Governance Committee is responsible for overseeing the nomination of directors for service on the Board and its committees and other related matters, overseeing the evaluation of the Board and reviewing and considering developments in corporate governance practices and to recommend to the Board a set of effective corporate governance policies and procedures applicable to the Company.

41.    The Nominating/Corporate Governance Committee Charter further provides that the

Nominating/Corporate Governance Committee's responsibilities were (among other things):

**Duties and Powers**

\*       \*       \*

*Board and Committee Nomination and Evaluation*

\*       \*       \*

**5.  Monitoring compliance with Board and Board committee membership criteria and developing and overseeing a Board performance evaluation process and evaluating at least annually the performance and effectiveness of the Board, including conducting surveys of director observations, suggestions and preferences, and discussing the results of such process with the Board.**

6.  Evaluating and, if deemed necessary, making recommendations on the removal of any Board member in accordance with the Code of Business Conduct and Ethics or the Guidelines, for cause or for other appropriate reason.

\*       \*       \*

*Corporate Governance*

**1.  Regularly reviewing issues and developments related to corporate governance and identifying and bringing to the attention of the Board current and emerging corporate governance issues and developments that may affect the business operations, performance or public image of the Company.**

2.  Evaluating at least annually the performance by management, the Board and each Board committee of their duties and responsibilities relating to corporate governance under the Company's Code of Business Conduct and Ethics, the Guidelines and the rules of Nasdaq and the SEC.

\*       \*       \*

6.  Conducting a preliminary review of director independence, and making recommendations to the Board relating to such matters.

7.  Reviewing the disclosures included in the Company's annual proxy statement regarding the Company's director nomination process and other corporate governance matters

**Resources and Authority**

The Committee may conduct or authorize investigations into or studies of matters within the Committee's scope of responsibility with full access to all books, records, facilities and personnel of the Company.

The Committee shall have the authority to engage outside legal, accounting or other advisors, as it determines necessary to carry out its duties. The Committee shall have sole authority to approve related fees and retention terms, and the Company shall provide the Committee with adequate funding to allow the Committee to perform its duties under this Charter.

\*       \*       \*

(Emphasis added).

14

42.     As Chairman, member or former member of the Audit Committee, Defendants Dugan, Cola, and Milano were required to comply with the Audit Committee Charter that was in place at the time of the alleged wrongdoing. The primary purpose of the Audit Committee is to provide oversight of (1) the quality and integrity of the Company's financial statements and other financial information provided by the Company to its stockholders; (2) the Company's retention of its independent accountants, including oversight of the terms of their engagement and their performance, qualifications and independence; (3) the effectiveness of the Company's internal controls and disclosure controls; and (4) the Company's compliance with its ethics policies and legal and regulatory requirements. The Audit Committee's Charter also places responsibility on the Audit Committee for preparing the report on this compliance for inclusion in the Company's annual proxy statement as required by the rules of the SEC.

43.     The Audit Committee is required to meet at least one time each fiscal quarter and at least annually with the Company's Chief Financial Officer, the independent accountants and, to the extent applicable, internal auditors. They are responsible for monitoring the Company's information and reporting systems to track the Company's compliance with the statutes and regulations.

44.     The Audit Committee Charter further provides that the Audit Committee's responsibilities are (among other things):

**Duties and Powers**
*       *       *
Financial Statements, Controls and Reports
*       *       *
**12. Review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during the certification process for the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q about any significant deficiencies or material weaknesses in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls, as contemplated by the Company's disclosure policies in effect from time to time.**
*       *       *

15

**16. Review the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q in advance of such filings. With the consent of the Committee, the Chair of the Committee may represent and act on behalf of the entire Committee for purposes of the review of any Quarterly Reports on Form 10-Q.**

\* \* \*

20. Review the reports prepared by management, and attested to by the Company's independent accountants, assessing the adequacy and effectiveness of the Company's internal controls and procedures, prior to the inclusion of such reports in the Company's periodic filings as required under the rules of the SEC; the Committee will also meet separately with the independent accountants, with and without management present, to discuss the results of their examination.

\* \* \*

Reporting and Recommendations

\* \* \*

28. Report the Committee's activities to the Company's CEO and the Board on a regular basis, including with respect to any issues that arise regarding the quality or integrity of the Company's financial statements, the effectiveness of the Company's internal controls or disclosure controls, the performance and independence of the Company's independent accountants and any other issue that the Committee believes should be brought to the attention of the Board. Such reports may be made orally or in writing.

Other Responsibilities

29. **Overseeing compliance with the disclosure requirements of the SEC, including disclosure of information regarding auditors' services, audit committee members, member qualifications and services**.

\* \* \*

32. Review and provide prior approval of all transactions or arrangements required to be disclosed pursuant to SEC Regulation S-K, Item 404, between the Company and any of its directors, officers, principal stockholders or any of their respective affiliates, associates or related parties.

\* \* \*

**36. Review the Company's compliance with applicable business ethics regulations and its Code of Business Conduct and Ethics, as amended or restated from time to time, and review complaints made pursuant to the Company's Whistleblower Policy in accordance with such policy as amended or restated from time to time.**

37. Performing such other duties as may be necessary or desirable to comply with the applicable laws, rules and regulations promulgated under the Sarbanes-Oxley Act, or by the SEC, Nasdaq or any other applicable governmental or regulatory agency, if such duties are customarily assigned to the Committee, or requested by the Board.

(Emphasis added).

16

## V.   SEC REQUIREMENTS

45.     SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

46.     Item 7 of Form 10-K and Item 2 of Form 10-Q require that a company's SEC filings furnish the information required under Item 303(a)(3) of Regulation S-K. Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC, among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

47.     The instructions for Item 303(a)(3) state that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

## VI.   SUBSTANTIVE ALLEGATIONS

### A.   Background

48.     Vanda is a biopharmaceutical company that focuses on the development and commercialization of drugs for the treatment of central nervous system disorders. The Company is incorporated in Delaware with its headquarters in Washington, D.C. The Company owns and markets two drugs, Fanapt and Hetlioz.

49.     Fanapt is a medication used to treat schizophrenia that was approved by the FDA in 2009, which at that time was marketed by Novartis. In December 2014, Vanda took over Fanapt's marketing.

50.     The approved FDA label for Fanapt states:

> FANAPT is an atypical antipsychotic agent indicated for the acute treatment of schizophrenia in adults. In choosing among treatments, prescribers should consider the ability of FANAPT to prolong the QT interval and the use of other drugs first. Prescribers should also consider the need to titrate FANAPT slowly to avoid orthostatic hypotension, which may lead to delayed effectiveness compared to some other drugs that do not require similar titration.

51.     Hetlioz is a circadian regulator *only approved* to treat Non-24-Hour Sleep-Wake Disorder ("Non-24"). Hetlioz purportedly resets the master body clock and aligns it with the 24-hour day. On January 19, 2010, the FDA granted Hetlioz orphan drug designation status for Non-24 in blind individuals without light perception. On January 31, 2014, Vanda announced that the FDA had approved Hetlioz 20 mg capsules for the treatment of Non-24.

52.     The prescriptions of both drugs are reimbursable under federal health care programs, including Medicare, Medicaid and Tricare.

### B.   Vanda's Alleged Violations of The Federal False Claim Act, States False Claim Acts and The FDCA

53.     Since at least November 2015, Vanda engaged in a scheme to promote Fanapt and Hetlioz for off-label uses, in addition to several other prohibited promotional strategies. Specifically, Vanda: (1) promoted Fanapt for uses outside of treating schizophrenia, the drug's sole indication; (2) promoted Fanapt off-label to pediatric patients; (3) overstated Fanapt's efficacy to providers; (4) made

false and misleading statements regarding Fanapt's safety warnings; (5) downplayed the safety risks associated with Fanapt ; (6) improperly provided titration packets which was in violation of the FDA-approved titration schedule and did not have adequate instructions for use; (7) promoted Fanapt as a first line therapy; (8) misused Fanapt copay cards; and (9) promoted Hetlioz for off-label uses.

54.     The costs of the prescriptions for these two drugs were reimbursed by federal health care programs, including Medicare, Medicaid and Tricare, and therefore reimbursement violated the Federal False Claim Acts, states' class action acts, and the FDCA. Accordingly, the Government was defrauded and suffered a substantial loss because of Defendants' misconduct.

### 1.  Vanda's Promotion of Fanapt for Off-Label Uses

55.     The Qui Tam Lawsuit alleges that Vanda senior management implemented a plan to promote the drug for off-label use even though Fanapt was approved by the FDA solely to treat adult schizophrenia patients. Specifically, the management team, including Defendant Polymeropoulos, instructed the Company's sales force to market Fanapt to healthcare providers as an effective substitute for other atypical antipsychotics that have more expansive indications and are commonly prescribed for bipolar disorder rather than schizophrenia, but without the Akathisia side effect and other safety concerns, positioning Fanapt as a superior treatment option for non-schizophrenia patients prescribed to a different atypical antipsychotic.

56.     The Fanapt Call Guidance sales aide, Reprieve study, and marketing materials for Fanapt provided to the sales representatives all demonstrate that the focus of the promotional scheme was on the drug's efficacy and side effects as compared to other atypical antipsychotics, and not schizophrenia. As a result, the marketing materials and sales techniques resulted in sales representatives promoting Fanapt as a cure for Akathisia, rather than a treatment option for schizophrenia.

57.     According to the Qui Tam Lawsuit, this marketing materials caused internal disputes among Vanda senior management. Kate Holland ("Holland"), Vanda's Vice President and Director of Marketing, vehemently protested the marketing materials and the marketing strategy that falsely presented Fanapt as a cure for Akathisia. However, despite Holland's protests, Defendant

Polymeropoulos refused to alter the marketing strategy, and as a result, Holland resigned in January 2016 along with Thomas Gibbs, Vanda's Senior Vice President and Chief Commercial Officer.

58.     Vanda subsequently removed the sales materials in March 2016, leaving the sales force without any marketing materials for several months. However, even though the marketing materials were removed, sales representatives were still instructed to continue marketing Fanapt in the same manner.

59.     The Qui Tam Lawsuit further alleges that Vanda senior management required its sales representatives to promote Fanapt off-label to meet their sales goals and receive incentive compensation.

60.     Jeff Bourgeois ("Bourgeois"), one of the Company's Regional Business Leaders ("RBLs"), told Reverberi that there was no market justifying the production of Fanapt to treat those types of schizophrenia. Moreover, doctors reported they were finding it extremely difficult to have Fanapt approved by commercial insurers because it was being prescribed off-label. Defendant Reverberi responded by telling Bourgeois that he did not believe him, and he asked what Bourgeois' plan was to turn his sales figures around. Vanda senior management consistently asked why the prescriptions numbers were not growing and kept telling RBLs that their sales representatives would have to be more aggressive to grow ahead of the market.

61.     Vanda senior management knew what they were doing was illegal. According to Bourgeois, Kate Arnold ("Arnold"), Vanda's head of compliance, contacted Bourgeois after reviewing his sales report, in which Bourgeois wrote that sales representatives need to "push" doctors to prescribe Fanapt. Instead of investigating this issue raised by several RBLs, Arnold asked Bourgeois to change the report's wording because Defendant Polymeropoulos was worried the government would initiate litigation.

62.     Richard Gardner ("Relator") voiced his concerns to Vanda senior management and suggested that sales goals and incentive compensation be based on FDA approved prescriptions only and eliminate all sales from off-label prescriptions. Management reflexively responded to Relator's concerns stating, "the goal is the goal" and "what are you worried about? We are paying on the total

dirt," and that the sales goals included the "total prescription universe." Defendant Reverberi went as far as to threaten the RBLs that they would be fired if they did not increase sales.

63. Relator and Bourgeois stated the target lists provided by Vanda were not only "for show" to shield Vanda from liability, but they also listed child psychiatrists, even though Fanapt was only indicated to treat schizophrenia in adult patients. The Company's senior management knew that sales representatives were calling on child psychiatrists to promote Fanapt off-label to their pediatric patients and took no action to stop this practice. To the contrary, the senior management required sales representatives to call on every doctor on their call list including child psychiatrists, in part, by compensating them on all prescriptions ultimately written, whether on or off-label.

64. Moreover, Fanapt was deemed by the FDA to be a second line treatment (a limitation) due to its risk of QT Prolongation. Vanda nevertheless trained its sales to tell providers that Fanapt no longer presented a risk of QT Prolongation and promote Fanapt as a first line drug. To further perpetuate the scheme, Defendant Polymeropoulos falsely told the Fanapt RBLs that if Fanapt was approved today, it would be approved as the first line drug. In addition, instead of instructing sales representatives that Fanpat patients should first try other therapy options before using Fanapt. Polymeropoulos falsely told the sales representatives that most patients tried other drugs prior to being prescribed Fanapt.

**2. Vanda Downplayed Safety Risks of Fanapt.**

65. Knowing Fanapt's safety profile may cause providers to prescribe their patients a different antipsychotic, Vanda senior management implemented sales techniques to downplay the safety risks associated with its drug Fanapt and Hetlioz. The use of misleading sales techniques is confirmed by an October 22, 2018 FDA Warning Letter to Defendant Polymeropoulos regarding Vanda's failure to include safety information in an advertisement on its website.

66. According to the Qui Tam Lawsuit, sales representatives were taught to use the phrase "placebo- like" when touting Fanapt's purported benign safety profile, even though Fanapt's actual side effect profile was not "placebo-like". Vanda knew that these statements were untrue. In fact, its own sales materials demonstrate that the side effect rate for Fanapt was higher for almost all side effects

than those presented by placebo. In addition, Vanda's marketing materials demonstrate that its messaging that Fanapt was "metabolically neutral," was also false.

67.     Vanda senior management also sought to minimize that Fanapt was associated with QTc Prolongation even though the FDA-approved label stated that Fanapt is associated with prolongation of the QTc interval. Instead of advising provides to consider using other antipsychotics first, Defendant Polymeropoulos trained the sales representatives to minimize the QTc Prolongation safety warning by saying that the only reason Latuda or Saphris did not have the QTc Interval Prolongation warning was because they were approved years after Fanapt, and, if Fanapt were approved today, it similarly would not have the QTc Prolongation warning.

### 3. Vanda Mislead Healthcare Providers About Fanapt's Approved Dosing Schedule.

68.     Vanda senior management trained its sales representatives to promote Fanapt as a once-a-day medication, even though Fanapt was approved by the FDA for a dosing amount of 12 to 24 mg per day, administered twice daily or BID. Fanapt sales representatives, instead, were instructed to tell physicians that because of its long half-life, administering the drug once a day or QD would treat patients' conditions just as effectively as when administered twice a day.

69.     This scheme was so successful that during a February 2015 earnings call, Defendant Polymeropoulos announced that Vanda would be increasing the price of 10 mg and 12 mg tablet prices 100% to account for once-a-day dosing to protect from losing revenue because of physicians prescribing Fanapt once per day. Specifically, Defendant Polymeropoulos stated:

> Fanapt comes in several doses -- 1 milligram, 2, 4, 6, 8, 10, 12 and a titration pack. Based on the demand and understanding how the product is used, we took a price increase on the 6 and 8 milligrams, which was a significant jump of about 30% or so. The 12 milligrams was adjusted in what appears to be 100% but actually it is consistent with the use of 12 milligrams as once a day, and therefore it was adjustment for usage. Now, the net Fanapt increase overall is actually small. It is about a 15% net, taking into account that 40% of the patients are on Medicaid, and price increases based on the legislation result in additional rebates leading to actually a decrease, a net decrease of the Medicaid channel.

22

70.     Moreover, the FDA-approved Fanapt label states that patients starting on the drug should use titration[2] to achieve the target dose. The official Fanapt titration pack, however, does not follow the FDA's approved titration schedule. Fanapt sales representatives in some territories even completely ignored the FDA-approved titration schedule and gave providers two or three titration packs, rubber banded together, to give to their patients starting Fanapt.

71.     According to Relator and Bourgeois, Vanda senior management made no attempt to correct the off-label message regarding the titration packs even though they were fully aware of the alleged misconduct. By providing several titration packs, Vanda helped ensure patients would titrate above the 6 mg effective mark, and therefore increase their target dose to the higher 12 mg twice daily dose. The distribution of multiple titration packs, rubber banded together, can result in patients dosing the titration packs according to the written instruction on the package, causing the patients to rapidly titrate Fanapt, thus increasing the risk for orthostatic hypotension (a dangerous side effect) and defeating the entire purpose of the FDA warning to slowly titrate Fanapt.

### 4.  Vanda's Misuse of Copay Cards

72.     Vanda participated in a fraudulent scheme to misuse Fanapt copay cards. According to the Qui Tam Lawsuit, during October and November 2015, there was a large spike in Fanapt prescriptions among a certain group of physicians in Detroit, which was the result of a fraudulent scheme between the physicians and local pharmacists to submit hundreds of Fanapt copay cards and prescriptions, receive reimbursement from the insurance provider, and then pocket the money because the prescriptions were never dispensed.

73.     Vanda was an active participant in this scheme because, according to Relator, Fanapt copay cards can only be provided by a Fanapt sales representative or manager. Therefore, in order for these physicians to obtain such a large quantity of copay cards, Vanda supplied the copay cards and subsequently sought to cover it up after others took notice. After Relator brought this issue to the

---

[2] Drug titration is the process of adjusting the dose of a medication for the maximum benefit without adverse effects. When a drug has a narrow therapeutic index, titration is especially important, because the range between the dose at which a drug is effective and the dose at which side effects occur is small Some examples of the types of drugs commonly requiring titration include insulin, anticonvulsants, blood thinners, anti-depressants, and sedatives.

management team, Ramirez, Head of Sales, helped conceal this scheme and instructed Relator not to discuss this matter ever again.

74.     As Fanapt's copay cards can be used by Medicare and Medicaid, which itself is a violation, the payments for these fake prescriptions were incurred by the government.

### 5. Vanda's Off-Label Promotion of Hetlioz

75.     The Qui Tam Action also alleges that Vanda wrongfully promoted its drug Hetlioz for off-label purposes. Hetlioz was granted orphan drug status by the FDA on January 19, 2010, for the treatment of Non-24 in blind patients without light perception. However, after releasing the drug, Vanda quickly targeted sighted patients as their primary market for Hetlioz.

76.     To pitch Hetlioz to providers, Defendant Polymeropoulos instructed the RBLs to direct their sales representatives to ask providers, "do you have any blind patients?" Regardless of the answer, sales representatives were instructed to state, "Hetlioz is a drug that is effective in treating circadian rhythm disruption" and to leave the provider with the Hetlioz sales packet. Qui Tam Cmplt., ¶ 193.

77.     Defendant Polymeropoulos also told the RBLs that psychiatrists would "connect the dots" and easily determine that if Hetlioz treats circadian rhythm disruption in Non-24 that it would also treat their nonblind patients experiencing other sleep disorders caused by circadian rhythm disruption, such as shift work sleep disorder, jet lag, and insomnia.

78.     Polymeropoulos told the RBLs that Vanda was currently seeking additional indications for Hetlioz.  Relator believes that Polymeropoulos said this to the RBLs so that they would relate this information to their sales representatives, who could use it in the field while promoting Hetlioz. Qui Tam Cmplt., ¶ 194.

79.     Vanda senior management positioned Hetlioz as a treatment option for all sleep disorders caused by circadian rhythm disruption by instructing sales representatives to focus their sales pitch primarily on Hetlioz's ability to treat circadian rhythm disruption. Fanapt sales representatives were instructed to introduce Hetlioz on every sales call. Sales representatives were instructed to emphasize that Hetlioz was not classified as a schedule drug by the FDA to convince physicians to use Hetlioz instead of other sleep aides. It is obvious that Vanda senior management intended its sales

representatives to promote Hetlioz as an effective substitute for all sleep aides to treat conditions outside of its indicated use (i.e., Non-24).

80.     To obtain off-label prescriptions, Vanda showed patients with mental disorders, concussions, or other head trauma misleading promotional pieces concerning Hetlioz. The Hetlioz Call Guidance sheets provided to RBLs further demonstrate Vanda's intent to promote Hetlioz to any psychiatric patients with sleep disorders, as opposed to patients with Non-24.

81.     According to Bourgois, many sales representatives quit over being forced to promote Hetlioz to sighted patients as a substitute for other sleep aides.

82.     This allegation is corroborated by a report entitled "Vanda: In the Land of The Blind, The One-Eyed Man in King" published by Aurelius Value ("Aurelius Report"), which states that many employees left during 2017. Further, the Report states that one employee stated he/she left because "Offloading the drug to patients that don't have the disorder . . . I couldn't do it, ethically."

**6.    Vanda's Scheme to Defraud the Government with Fraudulent Reimbursements.**

83.     Vanda senior management viewed government healthcare payors as easier targets to approve these off-label prescriptions because commercial insurance plans were pushing back against off-label prescriptions of Fanapt and Hetlioz. According to the Qui Tam Lawsuit, from 2015 to 2017, Medicaid and Medicare paid over $ 358 million for Fanapt prescriptions.

84.     As alleged in detail above, Vanda senior management marketed Fanapt and Hetlioz in a false and misleading way. This conduct illegally misbranded the drugs and constituted off-label promotion. Defendants knowingly caused the submission of false claims for reimbursement of Fanapt and Hetlioz by Government Health Care Programs, including Medicare, Medicaid and Tricare. Each of the claims for Fanapt and Hetlioz included an express and/or implied certification of compliance with federal and state law and regulations. Those certifications were false because the drugs were misbranded in violation of the FDCA and/or off-label. Further, those certifications were false or fraudulent because they falsely represented that Fanapt and Hetlioz were "reasonable and necessary" for the treatment of the patients and, therefore, the associated claims are ineligible for reimbursement.

85.     Knowingly submitting or causing the submission of claims for prescription drugs which are not reimbursable creates liability under the FCA. Thus, these claims to the government for reimbursement caused to be submitted by Vanda's unlawful conduct constitute violations of the Federal False Claim Act and state false claim acts.

### C. Defendants Caused Vanda to Issue False and Misleading Statements During the Securities Class Action Class Period in Breach of Myriad Fiduciary Duties.

86.     Vanda made materially false and/or misleading statements, as well as omitted disclosure of material adverse facts about the Company's business, operations, and prospects. Specifically, the Company failed to disclose to investors that: (1) Vanda was engaged in a fraudulent scheme in which the Company promoted Fanapt and Hetlioz for off-label uses; (2) Vanda was fraudulently receiving drug reimbursements from the government by abusing Medicare, Medicaid, and Tricare programs; (3) as a result of the scheme, Vanda faced a Qui Tam Lawsuit from the government; (4) Vanda's promotional materials for Fanapt and Hetlioz were false and misleading, garnering regulatory scrutiny from the FDA; and (5) as a result, the statements about Vanda's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

*November 3, 2015 Conference Call*

87.     On November 3, 2015, Vanda held a conference call to discuss the earnings for the third quarter of 2015. During the conference call, Defendant Polymeropoulos discussed the sales and marketing for Fanapt, stating in relevant part:

> We are seeking to stabilize the Fanapt revenue with active commercial efforts. Specifically, in early August, we launched a 12-person team in parallel territories around the United States. Early analysis of the data suggests that in these 12 territories, Fanapt revenue is beginning to stabilize. We're now in the process of further building out a small Fanapt dedicated sales force for a total of 50 territories around the country by the end of this year.
>
> *                   *                   *
>
> In July/August we launched our pilot, the Fanapt 12 looking at creating a competitive share of voice in certain territories to determine the promotional responsiveness of Fanapt when we had a competitive share of voice. And when we drilled down at the

individual territory level, we were able to measure the promotional response based up on reach and frequency. And based upon the early data, it provided a strong signal confirming the promotional sensitivity of Fanapt.

Based upon those data, we have decided to expand the Fanapt 12 to Fanapt 50, where we are going to be populating 50 of the most productive territories, creating a competitive share of voice, which we think we will be able to replicate the results that we saw within the Fanapt 12 and stabilize the Fanapt business exiting 2015.

\* \* \*

Fanapt comes in several doses -- 1 milligram, 2, 4, 6, 8, 10, 12 and a titration pack. Based on the demand and understanding how the product is used, we took a price increase on the 6 and 8 milligrams, which was a significant jump of about 30% or so. The 12 milligrams was adjusted in what appears to be 100% but actually it is consistent with the use of 12 milligrams as once a day, and therefore it was adjustment for usage. Now, the net Fanapt increase overall is actually small. It is about a 15% net, taking into account that 40% of the patients are on Medicaid, and price increases based on the legislation result in additional rebates leading to actually a decrease, a net decrease of the Medicaid channel.

\* \* \*

88.     The statements and omissions set forth above were false and misleading because Fanapt revenue, the abovementioned "competitive share of voice" and "promotional sensitivity" were driven, largely by improper, misleading and fraudulent sales practices, which include: (1) promoting Fanapt for uses outside of treating schizophrenia, the drug's sole indication; (2) promoting Fanapt off-label to pediatric patients; (3) overstating Fanapt's efficacy to providers; (4) downplayed the safety risks associated with Fanapt; (5) misleading providers about Fanapt's approved dosing schedule; (6) improperly providing titration packets which was in violation of the FDA-approved titration schedule and did not have adequate instructions for use; and (7) promoting Fanapt as a first line therapy.

*February 12, 2016 Form 10-K*

89.     On February 12, 2016, Vanda filed its annual report for the year ended December 31, 2015 with the SEC on Form 10-K ("2015 Form 10-K"). The Form 10-K was signed by Defendants Polymeropoulos and Kelly. It was also accompanied by signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Polymeropoulos and Kelly. Both Polymeropoulos and Kelly certified that the form "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading with respect to the period covered by this report." They also certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

90.     The 2015 Form 10-K discussed the uses and marketing of Fanapt and Hetlioz, stating in relevant part:

HETLIOZ®

Commercial opportunity: Non-24
In January 2014, HETLIOZ® was approved in the U.S. for the treatment of Non-24. Non-24 is a serious, rare and chronic circadian rhythm disorder characterized by the inability to entrain (synchronize) the master body clock with the 24-hour day-night cycle. HETLIOZ® is the first FDA approved treatment for Non-24. HETLIOZ® is a melatonin agonist of the human MT1 and MT2 receptors, with greater specificity for MT2. These receptors are thought to be involved in the control of circadian rhythms. HETLIOZ® is believed to reset the master body clock in the suprachiasmatic nucleus (SCN), located in the hypothalamus, resulting in the entrainment and alignment of the body's melatonin and cortisol rhythms to the 24hour day-night cycle. HETLIOZ® was launched commercially in the U.S. in April 2014. In addition, in July 2015, the EC granted centralized marketing authorization with unified labeling for HETLIOZ® for the treatment of Non-24 in totally blind adults. This authorization is valid in the 28 countries that are members of the European Union, as well as European Economic Area members Iceland, Liechtenstein and Norway.

In January 2010, the FDA granted orphan drug designation status for HETLIOZ® in Non-24 in blind individuals. The FDA grants orphan drug designation to drugs that may provide significant therapeutic advantage over existing treatments and target conditions affecting 200,000 or fewer U.S. patients per year. Orphan drug designation provides potential financial and regulatory incentives, including study design assistance, tax credits, waiver of FDA user fees, and up to seven years of market exclusivity upon marketing approval. In February 2011, the European Medicines Agency (EMA) designated HETLIOZ® as an orphan medicinal product for the same indication.

Non-24 is a serious, rare and chronic circadian rhythm disorder characterized by the inability to synchronize the master body clock with the 24-hour day-night cycle. Non-24 affects a majority of totally blind individuals, or between 65,000 and 95,000 people in the U.S. Non-24 occurs almost entirely in individuals who lack the light sensitivity necessary to synchronize the master body clock in the brain with the 24-hour day-night cycle. Most people have a master body clock that naturally runs longer than 24-hours and light is the primary environmental cue that resets it to 24 hours each day. Individuals with Non-24 have a master body clock that is not reset, and continually delays, resulting in prolonged periods of misalignment between their circadian rhythms and the 24-hour day-night cycle, including the timing of melatonin and cortisol secretion. As a result of this misalignment, Non-24 is associated with significant

disruption of the sleep-wake cycle and impairments in social and occupational functioning, and marked subjective distress**.** Individuals with Non-24 cycle in-and out-of phase and suffer from disrupted nighttime sleep patterns and/or excessive daytime sleepiness.

While there are no FDA or EC approved treatments for Non-24, other than HETLIOZ®, there are a number of drugs approved and prescribed for patients with sleep disorders. The most commonly prescribed drugs are hypnotics.

*       *       *

Fanapt®

Commercial Opportunity: Schizophrenia
Fanapt® is a product for the treatment of schizophrenia. In May 2009, the FDA granted U.S. marketing approval of Fanapt® for the acute treatment of schizophrenia in adults. In October 2009, we entered into an amended and restated sublicense agreement with Novartis. We had originally entered into a sublicense agreement with Novartis in June 2004 pursuant to which we obtained certain worldwide exclusive licenses from Novartis relating to Fanapt®. Pursuant to the amended and restated sublicense agreement, Novartis had exclusive commercialization rights to all formulations of Fanapt® in the U.S. and Canada. In January 2010, Novartis launched Fanapt® in the U.S. On December 31, 2014, Novartis transferred all the U.S. and Canadian commercial rights to the Fanapt® franchise to Vanda as part of the Settlement Agreement. See Note 3, Settlement Agreement with Novartis, to the consolidated financial statements included in Part II of this annual report on Form 10-K for additional information. In June 2015, we announced positive results from REPRIEVE, a Phase III long-term maintenance study that was conducted by Novartis. In September 2015, the FDA accepted for review a supplemental New Drug Application (sNDA) for Fanapt® for the maintenance treatment of schizophrenia in adults. The FDA has set a May 2016 PDUFA date for the Fanapt® sNDA.

91.     The 2015 Form 10-K also discussed reimbursement from government programs, stating in relevant part:

**Third-party reimbursement and pricing controls**
The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Affordability Reconciliation Act of 2010, collectively referred to as the ACA, has changed and is expected to further significantly change the way healthcare is financed by both governmental and private insurers. The provisions of the ACA became effective over various periods from 2010 through 2014. We cannot predict the complete impact of the ACA on pharmaceutical companies because many of the ACA's reforms require the promulgation of detailed regulations to implement the statutory provisions, which has not yet occurred. While we cannot predict the complete impact on federal reimbursement policies this law will have in general or specifically on any product we commercialize, the ACA may result in downward pressure on pharmaceutical reimbursement, which could negatively affect market acceptance of new

products. The rebates, discounts, taxes and other costs resulting from the ACA may have a significant effect on our profitability in the future. In addition, potential reductions of the per capita rate of growth in Medicare spending under the ACA, could potentially limit access to certain treatments or mandate price controls for our products. Moreover, although the United States Supreme Court has upheld the constitutionality of most of the ACA, some states have indicated that they intend not to implement certain sections of the ACA, and some members of the U.S. Congress are still working to repeal the ACA. We cannot predict whether these challenges will continue or other proposals will be made or adopted, or what impact these efforts may have on us or our partners.

In the U.S. and elsewhere, sales of pharmaceutical products depend in significant part on the availability of reimbursement to the consumer from third-party payors, such as government and private insurance plans. Third-party payors are increasingly challenging the prices charged for medical products and services. It will be time consuming and expensive for us or our partners to go through the process of seeking reimbursement from Medicare and private payors. Our products may not be considered cost-effective, and coverage and reimbursement may not be available or sufficient to allow us or our partners to sell our compounds on a competitive and profitable basis. The passage of the Medicare Prescription Drug and Modernization Act of 2003 imposes additional requirements for the distribution and pricing of prescription drugs which may affect the marketing of our products.

   a.  *February 17, 2017 Form 10-K*

92.    On February 17, 2017, the Company filed a Form 10-K for the year ended December 31, 2016 ("2016 10-K") with the SEC, which provided the Company's full year 2016 financial results and position. The 2016 10-K was signed by Defendants Polymeropoulos and Kelly. Both Polymeropoulos and Kelly certified that the form "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." They also certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

93.    The 2016 10-K discussed the uses and marketing of Fanapt and Hetlioz, and also reimbursement from government programs. In addition to the statements provided in the 2015 10-K, the 2016 10-K added:

   On December 31, 2014, Novartis transferred all the U.S. and Canadian commercial rights to the Fanapt® franchise to Vanda as part of the Settlement Agreement. See Note 3, Settlement Agreement with Novartis, to the consolidated financial statements included in Part II of this

annual report on Form 10-K for additional information. In June 2015, we announced positive results from REPRIEVE, a Phase III longterm maintenance study that was conducted by Novartis. In May 2016, the FDA approved a supplemental New Drug Application (sNDA) for Fanapt® for the maintenance treatment of schizophrenia in adults.

   b. *February 15, 2018 Form 10-K*

94. On February 15, 2018, the Company filed a Form 10-K for the year ended December 31, 2017 ("2017 10-K") with the SEC, which provided the Company's full year 2017 financial results and position. The 2017 10-K was signed by Defendants Polymeropoulos and Kelly. The 2017 10-K contained signed SOX certifications by Defendants Polymeropoulos and Kelly. Both Polymeropoulos and Kelly certified that the form "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." They also certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

95. The 2017 10-K discussed the uses and marketing of Fanapt and Hetlioz, and also reimbursement from government programs. In addition to the statements provided in the 2015 10-K and 2016 10-K, the 2017 10-K added:

HETLIOZ®

     *  *  *

Non-24 affects a majority of totally blind individuals, or approximately 80,000 people in the U.S. Blind individuals who develop Non-24 lack the light sensitivity necessary to synchronize the master body clock in the brain with the 24-hour day-night cycle. In sighted individuals, decreased exposure or sensitivity to light and social and physical activity cues may contribute to a freerunning circadian rhythm. With the high frequency of mental disorders involving social isolation and cases of Non-24 developing after a change in sleep habits, behavioral factors in combination with physiological tendency may precipitate and perpetuate this disorder in sighted individuals. Hospitalized individuals with neurological and psychiatric disorders can become insensitive to social cues, predisposing them to the development of Non-24. The 2017 10-K discussed reimbursement from government programs, stating in relevant part:

     *  *  *

Fanapt®

*     *     *

In July 2017, the EMA's Committee for Medicinal Products for Human Use (CHMP) issued a negative opinion recommending against approval of Fanaptum® (oral iloperidone tablets) for the treatment of schizophrenia in adult patients in the E.U. The CHMP was of the opinion that the benefits of Fanaptum® did not outweigh its risks and recommended against marketing authorization. The negative opinion was upheld upon appeal in November 2017.

We received market approval for the commercialization of Fanapt® in Israel in August 2012 and in Mexico in October 2013. Our distribution partners launched Fanapt® in Israel and Mexico in 2014. As of December 31, 2017, we no longer have an active distributor relationship in Mexico.

Schizophrenia is a chronic, debilitating mental disorder characterized by hallucinations, delusions, racing thoughts and other psychotic symptoms (collectively referred to as "positive symptoms"), as well as moodiness, anhedonia (inability to feel pleasure), loss of interest, eating disturbances and withdrawal (collectively referred to as "negative symptoms"), and attention and memory deficits (collectively referred to as "cognitive symptoms"). Schizophrenia develops in late adolescence or early adulthood in approximately 1% of the world's population. Most schizophrenia patients today are treated with drugs known as "atypical" antipsychotics, which were first approved in the U.S. in the late 1980s. These antipsychotics have been named "atypical" for their ability to treat a broader range of negative symptoms than the first-generation "typical" antipsychotics, which were introduced in the 1950s and are now generic. Atypical antipsychotics are generally regarded as having improved side effect profiles and efficacy relative to typical antipsychotics. See Competition below for a discussion of commonly prescribed atypical antipsychotics in addition to Fanapt®.

Pursuant to a settlement agreement with Novartis, we reacquired the U.S. and Canadian rights to the long-acting injectable (depot) formulation of Fanapt®. We are evaluating the commercial opportunity around the depot formulation.

*     *     *

96.     The statements and omissions set forth in the 2015, 2016 and 2017 10-K were false and misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) promoting Fanapt and Hetlioz for off-label uses; (2) overstating Fanapt's efficacy to providers; (4) ) downplayed the safety risks associated with Fanapt; (5) misleading providers about Fanapt's approved dosing schedule; (6) improperly providing titration packets which was in violation of the FDA-approved titration and did not have adequate instructions for use; (7) promoting Fanapt as

a first line therapy; (8) fraudulently receiving drug reimbursements from the government by abusing Medicare, Medicaid, and Tricare programs as a result of the scheme, Vanda faced a Qui Tam Lawsuit from the government; (9) Vanda's promotional materials for Fanapt and Hetlioz were false and misleading, garnering regulatory scrutiny from the FDA; and (10) as a result, Defendants' statements about Vanda's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

97.    On April 27, 2018, Defendants caused the Company to file with the SEC its Schedule 14A (the "2018 Proxy Statement").  The Director Defendants Polymeropoulos, Cola, Dugan, Watkins, and former director Milano solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

98.    The 2018 Proxy Statement stated that the Company adopted the "Vanda Pharmaceuticals Inc. Code of Ethics and Business Conduct that applies to all directors, officers and employees. This code is available in the Corporate Governance section of our corporate website at www.vandapharma.com. If we make any substantive amendments to this code or grant any waiver from a provision of the code to any applicable executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website." Accordingly, the 2018 Proxy Statement incorporates by reference the information contained in the Code of Ethics referenced above at ¶39.[4]

99.    The 2018 Proxy Statement detailed "Risk Oversight" duties:

> Our Board oversees the management of risks inherent in the operation of our business and the implementation of our business strategies. The general categories of risk overseen by the our Board include, without limitation, operational risk, commercial risk, clinical trial risk, capital risk, credit risk, earnings risk, liquidity risk, market risk, price risk, legal/compliance risk, cyber risk and reputational risk. Our Board performs this oversight role by using

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of any of the Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness about these allegations and related claims.

[4] *See* Vanda Code of Ethics at https://vandapharmaceuticalsinc.gcs-web.com/static-files/3bc193a2-45a7-4b99-870c-eb30c53ff6be (last visited 7/19/19).

several different levels of review. In connection with its reviews of the operations and corporate functions of our Company, our Board provides oversight to address the primary risks associated with those operations and corporate functions. In addition, our Board reviews the risks associated with the Company's business strategies periodically throughout the year as part of its consideration of undertaking any such business strategies.

Each committee of our Board also oversees the management of the Company's risk that falls within the committee's areas of responsibility. In performing this function, each committee has full access to management, as well as the ability to engage advisors. Our Chief Financial Officer reports to the Audit Committee and is responsible for identifying, evaluating and implementing risk management controls and methodologies to address any identified risks. In connection with its oversight role, our Audit Committee meets privately with representatives from our independent registered public accounting firm and our Chief Financial Officer.

100.    The 2018 Proxy Statement details the duties of the Audit Committee and how it takes affirmative steps concerning integrity:

Audit Committee
The Audit Committee of the Board oversees the quality and integrity of the Company's financial statements and other financial information provided to the Company's stockholders, the retention and performance of the Company's independent accountants, the effectiveness of the Company's internal controls and disclosure controls, and the Company's compliance with ethics policies and SEC and related regulatory requirements. For these purposes, the Audit Committee, among other duties and powers, (1) approves audit fees for, and selects and reviews the performance of, the Company's independent accountants, (2) reviews reports prepared by management, and attested by the Company's independent accountants with respect to the financial statements contained therein, assessing the adequacy and effectiveness of the Company's internal controls and procedures, prior to the inclusion of such reports in the Company's periodic filings as required under the rules of the SEC, (3) reviews the Company's annual and quarterly reports, and associated consolidated financial statements, with management and the independent accountants prior to the first public release of the Company's financial results for such year or quarter, (4) reviews with external counsel any legal matters that could have a significant impact on the Company's financial statements, and (5) establishes and maintains procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters. Our Audit Committee

charter can be found in the Corporate Governance section of our corporate website at www.vandapharma.com. Three directors comprised the Audit Committee as of December 31, 2017: Mr. Dugan (the Chairman of the Audit Committee), Mr. Cola and Mr. Milano. The Audit Committee met nine times during 2017.

The Board annually reviews the Nasdaq listing standards definition of independence for Audit Committee members and has determined that all members of our Audit Committee are independent (as independence is currently defined in applicable Nasdaq listing standards and Rule 10A-3 promulgated under the Exchange Act).

101.    The 2018 Proxy Statement was materially misleading because it negligently misrepresented the Board's actual activities with respect to risk management while soliciting votes to re-elect and compensate directors who were breaching their fiduciary duties. A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

102.    The 2018 Proxy Statement was further false and misleading because, despite assertions to the contrary, the Company Code of Conduct was not followed, as the Director Defendants made and/or caused the Company to make the false and misleading statements discussed herein. Additionally, the 2018 Proxy Statement was materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.

**The Truth Emerged Concerning Defendants' Misconduct**

103.    On October 22, 2018, the FDA sent Vanda a Warning Letter which was addressed to Defendant Polymeropoulos (the "Warning Letter"). The Warning Letter was in response to the FDA's review of Vanda's website which the FDA found "false and misleading" due to its failure to disclose risks of the Fanapt and Hetlioz and in violation of the FDCA. The FDA raised its concerns with the promotional materials for these drugs. The Warning Letter states that "This webpage is false or misleading in that it presents information about the benefits of Fanapt and Hetlioz, but fails to include any risk information about either drug. Thus, the webpage misbrands Fanapt and Hetlioz within the meaning of the Federal Food, Drug and Cosmetic Act (FD&C Act) and makes their distribution violative. 21 U.S.C. 352(a) & (n); 321(n), 331(a). See 21 CFR 202.1(e)(5). This violation is concerning

from a public health perspective because it creates a misleading impression about the safety of Fanapt and Hetlioz. Of particular concern is that Fanapt is a drug that bears a Boxed Warning due to serious, life-threatening risks, including increased mortality in elderly patients with dementia-related psychosis, as well as numerous other warnings.

104.    The Warning Letter further explains the standard for determination of whether promotional materials are misleading and emphasizes that "The webpage includes claims and/or representations about the uses and/or benefits of Fanapt and Hetlioz; however, it fails to communicate any risk information about the products . . . By omitting the risks associated with Fanapt and Hetlioz, the webpage fails to provide material information about the consequences that may result from the use of the drugs and creates a misleading impression about the drugs' safety. This misleading presentation is especially problematic from a public health perspective due to the serious and potentially life-threatening risks associated with the drugs, such as those contained in Fanapt's Boxed Warning."

105.    On this news, shares of Vanda fell $2.00 per share or over 9% over the next two trading days to close at $20.00 per share on October 24, 2018.

106.    On February 4, 2019, the Qui Tam Lawsuit, *United States of America, ex rel. Richard Gardner v. Vanda Pharmaceuticals*, Case No. 1:17-cv-00464-APM (D.D.C.), which disclosed Vanda's years of fraudulent promotion of Fanapt and Hetlioz as well as its scheme to defraud the government with fraudulent reimbursements was unsealed.

107.    On February 11, 2019, the Aurelius Report revealed the Qui Tam Lawsuit and provided a summary of the claims and a link to the complaint filed in the action. In addition to the information provided in the Qui Tam Lawsuit, the Aurelius report, further stated in relevant part:

> Our research indicates that Vanda has had an extremely difficult time attracting and keeping blind patients on Hetlioz, the population the drug was tested on and designed to treat. In order to meet growth targets, we believe Vanda's "secret sauce" is a product of Polymeropoulos harnessing the Fanapt sales force to begin selling Hetlioz to psychiatrists as a sleep aide alternative to Ambien and Lunesta for sighted patients. The principal problem is that taxpayers appear to be on the hook for Polymeropoulos' alleged shenanigans.

Non-24 is so rare that Vanda had to cut patient enrollment of its FDA trials of Hetlioz in half because it could not identify enough patients with the condition. This makes it exceedingly difficult for Vanda to sell Hetlioz to patients with Non-24, which one former rep described as the classic "needle in the haystack" exercise. After launch in 2014, Vanda's strategy was centered on building awareness by sending sales reps to blind community centers and running tv and radio spots to target friends and family members, an effort that initially appears to have been somewhat fruitful.

But our research also indicates that Hetlioz has unfavorable levels of front-end patient churn, meaning patients who begin treatment often drop off in the first six months.  One explanation is that the drug simply doesn't work very well for some patients.

*        *        *

We also examined data from the FDA Adverse Event Reporting System ("FAERS"), which contains information on medication error reports submitted to the FDA.  The single most frequently reported adverse event is the complaint of "drug ineffective" which, when combined with similar complaints about efficacy, totals 888 complaints since 2014, an amount which exceeds the number of patients currently on Hetlioz. In fact, questions about Hetlioz's efficacy date back to 2013, when Health Care columnist Adam Feuerstein identified "a disturbingly large number of irregularities and red flags" related to Vanda's clinical trials of Hetlioz.

108.    On this news, shares of Vanda fell $0.95 per share or over 5% to close at $18.00 per share on February 11, 2019.

109.    Further, as a direct result of Defendants Polymeropoulos and Kelly's omissions of the abovementioned material information and misleading statements about Vanda's business, operations and prospects, the Company is now the subject of the Securities Class Action.

110.    As a result of the Individual Defendants' misconduct, Vanda sustained damages, including, but not limited to, costs and expenses incurred in connection with the legal action taken against the Company.

## VII.    THE DIRECTOR DEFENDANTS AND OFFICER DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES.

### A.  The Officer Defendants Breached Their Fiduciary Duties

111.    The Officer Defendants have breached their duties of care and loyalty by knowingly violating the Federal False Claim Act, state false claim acts, the FDCA and federal securities laws.

112.    The Officer Defendants, especially Polymeropoulos and Reverberi, have actual knowledge of the fraudulent marketing and promotion of Fanapt and Hetlioz for off-label uses and actively participated in this scheme.

113.    As discussed above, Defendant Polymeropoulos built the fraudulent marketing scheme from scratch and participated in every stage of the alleged illegal conduct.

114.    Defendant Polymeropoulos instructed sales representatives to promote Fanapt and Hetlioz for off-label use, and refused to alter the marketing strategy designed to promote Fanapt as a cure for Akathisia, resulting in noisy resignations of Gibbs and Holland, who vehemently protested this marketing strategy. Defendant Polymeropoulos also directed the sales representatives to promote Fanapt as a first line treatment despite FDA's limitation, instructed the sales representatives to promote Fanapt as a once-a-day medication despite its FDA approved indication, implemented sales techniques to downplay or completely omit safety information for Fanapt and Hetlioz, and knowingly concealed the fraudulent scheme to misuse Fanapt copay cards.

115.    Defendant Polymeropoulos was also perfectly aware that he was building an illegal fraudulent scheme which could result in legal actions from the government. To conceal their misconduct, Vanda's head of compliance, Kate Arnold instructed the RBLs not to describe their sales effort as "push"[ing] doctors to prescribed Fanapt in their sales report.

116.    Moreover, Defendant Polymeropoulos has turned Vanda into an increasingly nepotistic organization by transferring authority of key departments to his children. His son, Christos Polymeropoulos started working in Vanda as a Medical Director in October 2014, and was promoted to Pharmacovigilance Medical Director and Program Lead effective March 1, 2017. His daughter, Katerina Polymeropoulos, started as a Health Educator on September 29, 2014, and was promoted to Marketing Coordinator in March 2017. His other son, Vasilios Polymeropoulos, started working in Vanda as a Director of Medical Analytics on February 12, 2018.

117.    Defendant Reverberi has always been an active player in the alleged violations.  He even threatened the sales representatives to meet the unrealistic sales goals, which can only be achieved

by promoting Fanapt for off-label uses and caused recurring issues between the RBLs and Vanda senior management.

118.    Moreover, Defendant Reverberi is not new to this kind of off-label marketing and promotion scheme. Prior to joining Vanda, Defendant Reverberi served as Senior Vice President, International Specialty Pharma at Shire Pharmaceuticals ("Shire"). From 2009 to 2013, Reverberi led Shire's Internal Medicine Global Business Unit where his responsibilities included the management of the U.S. Sales and Marketing teams. During his tenure, one of his colleague, Shire's former Vice President, Gerardo Torres, along with other Shire former employees, brought qui tam actions against Shire alleging violations of the False Claims Act for allegedly making false and unsupported claims related to Adderall XR, Vyvanse, Daytrana, and promoting off-label uses of its two drugs, Pentasa, and Lialda happened since 2007. As the Vice President that led Shire's Sales and Marketing team, Defendant Reverberi must have participated in the fraudulent promotion or at least had actual knowledge of the violations happened in the Shire. While after joining Vanda, Defendant Reverberi, as a repeat offender, continued to market and promote the drugs for off-label uses despite the fact that he has clear knowledge of the damage that would be done to the Company and the shareholders.

119.    As a direct result of the Officer Defendants' unlawful conduct, the Company is now the subject of a Qui Tam Lawsuit filed in the United Stated District Court for the District of Columbia. As a result of the Officer Defendants' misconduct, Vanda sustained damages, including, but not limited to, costs and expenses incurred in connection with the legal action taken against the Company.

120.    As discussed before, each director and officer of the Company owes to Vanda and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. Here, the Officer Defendants willfully ignored their obligations under federal and state laws, FDA regulations and their duty to run Vanda in a legal and ethical manner under Vanda's Code of Business Conduct and Ethics. Defendants failed to make a good faith effort to correct the problems or prevent their recurrence. To the contrary, they actively participated in the fraudulent violations of

laws and regulations. Therefore, the Officer Defendants have breached the fiduciary duties willfully and consciously.

121.     Moreover, Defendants Polymeropoulos and Kelly have breached their duty of care and loyalty by making materially false and/or misleading statements, as well as omitting disclosure of material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) Vanda was engaged in a fraudulent scheme in which the Company promoted the off-label use of Fanapt and Hetlioz; (2) Vanda was fraudulently receiving drug reimbursements from the government by abusing Medicare, Medicaid, and Tricare programs; (3) as a result of the scheme, Vanda faced a Qui Tam Lawsuit from the government; (4) Vanda's promotional materials for Fanapt and Hetlioz were false and misleading, garnering regulatory scrutiny from the FDA; and (5) as a result, Defendants' statements about Vanda's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

122.     Despite the misleading statements, the truth eventually emerged. On October 22, 2018, the FDA sent Vanda the Warning Letter regarding Vanda's website, which the FDA found "false and misleading" due to its failure to disclose risks of the Fanapt and Hetlioz and in violation of the FDCA. In the Warning Letter, the FDA raised its concern regarding Vanda's promotion materials. On this news, shares of Vanda fell $2.00 per share or over 9% over the next two trading days to close at $20.00 per share on October 24, 2018.

123.     On February 11, 2019, Aurelius Value published a report entitled, "Vanda: In the Land of The Blind, The One-Eyed Man in King." This report revealed the Qui Tam Lawsuit which disclosed Vanda's fraudulent marketing and promotion of Fanapt and Hetlioz for off-label uses as well as Vanda's scheme to defraud the government with fraudulent reimbursements. On this news, shares of Vanda fell $0.95 per share or over 5% to close at $18.00 per share on February 11, 2019.

124.     As a direct result of the Officer Defendants' unlawful conduct, the Company is now the subject of a Securities Class Action. Vanda sustained damages, including, but not limited to, costs and expenses incurred in connection with the legal action taken against the Company.

125.    As Company fiduciaries, Defendants Polymeropoulos and Kelly knew, or should have known about the aforementioned misconduct and the risks associated with the violation of the Federal False Claim Act, state false claim acts, the FDCA and federal securities laws. However, rather than admit the truth, Defendants misled investors to believe that Vanda has fully complied with relevant laws and regulations and that Vanda was not being adversely impacted by these alleged violations. Defendants failed to make a good faith effort to disclose these material facts or correct the misleading statements. To the contrary, the Officer Defendants approved and permitted the misconduct alleged herein to have occurred, participated in efforts to conceal or disguise the misconduct from the Company's stockholders, and authorized and permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders.

126.    Therefore, the Officer Defendants have breached the fiduciary duties willfully and consciously.

**B.  The Board Consciously Failed to Carry Out Oversight Duties**

127.    It is evident that the directors and officers enabled and created an environment in which Vanda continued to place profit over public health. It is also evident that the Board has failed to maintain or improve its controls and has not shifted its focus to placing safety of consumers and the people of the United States above its own short-term profit. Instead, the Board allowed Vanda to repeat violations of the Federal False Claim Act, states false claim acts, and federal securities laws, and ignore its own internal policies for abiding by the laws and regulations that apply to advertising and promotion of our products, including rules of the FDA and other regulatory authorities. As such, Plaintiff was left with no choice but to bring this derivative action, on behalf of Vanda to remedy the directors' and officers' misconduct and to place the Company's long-term success ahead of short-term and myopic profiteering. Unless this Court acts to change the culture of Vanda, the alleged misconduct will continue to cause substantial financial and reputational harm to Vanda.

128.    Facts sufficiently support a reasonable inference that there was a conscious lack of any system of Board-level controls and reporting. The Board consciously left reporting and controls

completely to the discretion of management to determine what controls were necessary and sufficient and when and whether to bring information to the Board.

129.    It appears that there is no Board committee that addresses drug promotion or safety. Had the Board implemented a regular process or protocols to keep the Board apprised of drug promotion or safety compliance practices and risks, it could have taken timely preventive actions.

130.    Moreover, during the key period that the alleged misconduct happened, the Board received noisy resignations from four senior officers, Holland, Gibbs, Baroldi, and Gulino, which raised or should have raised red, or at least yellow, flags about the internal disputes regarding Vanda's dubious marketing scheme. The Board's inaction simply shows that the Board either recklessly disregarded the years' violations happened in the Company or completely failed to monitor and oversee compliance with various laws and regulations that apply to Vanda's business, raising a reasonable inference that the Board received little information about drug marketing and promotion by management, and that the Board meetings are devoid of any suggestion that there was any regular discussion of relevant issues.

131.    During the time of the wrongful conduct, the Board consisted of Watkins, Polymeropoulos, Cola, Dugan, Milano, Bate and Pien.

132.    As set forth above, as an active participant in the fraudulent scheme, Defendant Polymeropoulos has actual knowledge of the alleged misconduct happened in the Company.

133.    Moreover, the directors have a duty to operate Vanda in a legal and ethical manner under the Company's Code of Business Conduct and Ethics, which specifically requires officers and directors to abide by the laws and regulations that apply to advertising and promotion of our products, including rules of the FDA and other regulatory authorities.

134.    Defendant Watkins, as the Chairman of the Board, is responsible for failing to implement the appropriate disciplinary action for any officer or director who is found to have violated the Company's Code of Business Conduct and Ethic. Moreover, as the as the Chairman on the Nominating/Corporate Governance Committee, he has failed his responsibilities to monitor and oversee corporate governance and abide by Company's Code of Business Conduct and Ethics. As

members of the Nominating/Corporate Governance Committee, Defendant Dugan also completely failed to carry out his obligations to monitor and oversee corporate governance and abide by Company's Code of Business Conduct and Ethics. Even if they did not themselves participated in the abovementioned misconduct, they had or should have actual knowledge of the years' violations. Not only did they failed to make any disciplinary actions against the executive officers that actually participated in this scheme, they also utterly failed to oversee the operations of Vanda, thereby disabling them from being informed of the years' violations. Therefore, Defendants Watkins and Dugan have breached their fiduciary duty by failing to act in conscious disregard where they have a known obligation to act.

135.     Defendants Cola, Milano and Dugan have breached their fiduciary duty during their tenure on the Audit Committee. Defendants Cola, Milano and Dugan served on the Board and the Audit Committee at all relevant times. As set forth above, the Audit Committee's charter imposes specific duties on members of this committee to ensure compliance with laws, regulations and internal policies.   As members of the Audit Committee, they allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the deficiencies described above. Therefore, Defendants Cola, Milano and Dugan violated their fiduciary duties to act in good faith to address the violations of law complained of herein.

## VIII.    DAMAGES TO VANDA

136.     As a result of the Individual Defendants' improprieties, Vanda and its shareholders have sustained and will continue to sustain damages and injuries for which they have no adequate remedy at law. Vanda is currently facing significant liability from a Qui Tam Lawsuit filed by relator on behalf of United States Of America, the States Of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island,

Tennessee, Texas, Vermont, Washington, the Commonwealth of Massachusetts, Virginia, the District of Columbia, and the policyholders of XYZ Nos. 1-10 Insurance Companies. Vanda has incurred substantial expenses relating to the investigation of the abovementioned misconduct and wrongdoing including legal fees and expenses, the potential for compensation to individual States, insurance companies, and regulatory fines and penalties.

137.    Vanda is also the subject of a Securities Class Action as a result. The improper and misleading statements also devastated the Company's credibility and future prospects as evidenced by the collapse of the Company's stock price following the disclosure of the truth. In addition, as a direct and proximate result of the Individual Defendants' actions, Vanda has expended, and will continue to expend, significant sums of money. Such expenses include, but are not limited to: costs and damages incurred from defending and paying any settlement or judgment in the Securities Class Action; costs incurred to investigate the wrongdoing internally; and costs incurred from compensation and benefits paid to Defendants who breached their fiduciary duties to the Company.

## IX.    DEMAND FUTILITY

138.    Plaintiff brings this action derivatively on behalf of Vanda to redress injuries suffered, and to be suffered, by the Company as a direct and proximate result of breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

139.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

140.    Plaintiff will adequately and fairly represent the interests of Vanda in enforcing and prosecuting its rights and has retained counsel competent and experienced in stockholder derivative litigation.

141. Plaintiff did not make a demand on the Board prior to instituting this stockholder derivative litigation because a pre-suit demand upon the Board would be a futile, wasteful and useless act.

142. At the time of this filing, the Board consists of five directors, four of which are the Director Defendants: Watkins, Polymeropoulos, Cola, and Dugan.

143. As discussed above, Vanda's executives knowingly and consciously violated the Federal False Claims Act, state false claim acts, the FDCA and federal securities laws. The Board implemented and oversaw a business strategy that resulted in widespread and repeated violations of the law. Promoting drugs for off-label use, submitting fraudulent bills to the government, making public misrepresentations and/or failing to disclose material facts are not legally protected business decisions and such conduct can in no way be considered a valid exercise of business judgment.

144. The Director Defendants were responsible for a sustained or systemic failure of the Board to exercise oversight. The sustained failure of the Board to ensure effective corporate governance and ensure compliance with the laws can only have been a result of Defendants' knowing breach or reckless disregard for their fiduciary duties. The Director Defendants either knew or should have known of the years' violations and false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

145. The Board devoted patently inadequate time or consciously disregarded compliance with the federal and state law and regulations. The Director Defendants' conduct resulted in the Company suffering damages and injuries, which was in violation of, among other things, these Defendants' fiduciary duties of good faith and loyalty, as well as Vanda's own Corporate Governance Guidelines and Code of Business Conduct and Ethics. The Director Defendants' decision to not act was not made in good faith and was contrary to the best interests of the Company.

146. Therefore, the Director Defendants each face a substantial likelihood of personal liability for their acts in connection with these actions, rendering a demand upon them futile.

**A. Demand Is Futile Against Defendant Polymeropoulos**

147.     Defendant Polymeropoulos served as President, Chief Executive Officer and director of Vanda during the Relevant Period. As an officer and board director, Polymeropoulos face a substantial likelihood of liability if there is reason to doubt that he breached his duty of care.

148.     As alleged above, Defendant Polymeropoulos breached his duty of care and loyalty by knowingly violating the Federal False Claims Act, state false claims acts, the FDCA and applicable regulatory and ethical guidance by submitting fraudulent bills to the government because of off-label marketing and other prohibited marketing strategies. Defendant Polymeropoulos also knowingly or recklessly made or disseminated made false and/or misleading statements and/or failed to disclose material information regarding Vanda's fraudulent promotion scheme and abuse of Medicare, Medicaid, and Tricare programs, thereby violating the federal securities laws.

149.     As such, Defendant Polymeropoulos faces a substantial likelihood of liability for violating the federal securities laws and breaching his fiduciary duty of due care by causing the Company to violate the Federal False Claim Act, states false claim acts, the FDCA and the securities laws.

150.     For these reasons, demand is futile against Defendant Polymeropoulos.

**B.  Demand Is Futile Against the Director Defendants Watkins, Cola, and Dugan Due to Breach of Fiduciary Duties**

151.     From 2015 to early 2018, four key executives resigned. Vanda's Vice President and Director of Marketing, Kate Holland resigned in January 2016 after *vehemently protesting Vanda's fraudulent marketing strategy*. Along with her, Thomas Gibbs, Vanda Senior Vice President and Chief Commercial Officer also resigned after the internal disputes.

152.     In 2017, Vanda's Senior Vice President and Chief Medical Officer Paolo Baroldi resigned as an officer and employee of the Company. In 2018, Vanda's Senior Vice President, General Counsel and Secretary Richard L. Gulino resigned as an officer and employee of the Company.

153.    Board Members Watkins, Polymeropoulos, Cola, and Dugan certainly had actual knowledge of these resignations from the Chief/Director of almost all sectors that involves in the marketing and promotion of Fanapt and Hetlioz, which implicates problems with Vanda's daily business and operations. Specifically, Holland and Gibbs's resignations after protesting Vanda's fraudulent marketing did or at least should have put the Board on notice of the alleged misconduct that happened in the Company. The Board's inaction can only prove that it devoted patently inadequate time to oversight or consciously disregarded its duty of care.

154.    Moreover, Defendants Watkins and Dugan are conflicted from considering demand because they each face substantial likelihood of liability because of their participation in and obligations arising from being Chairman and members of the Nominating/Corporate Governance Committee. As detailed above, the Corporate Governance Committee charter and Company's Code of Business Conduct and Ethics required the members of the committee to monitor and oversee corporate governance. Not only did they failed to make any disciplinary actions against the executive officers that actually participated in this scheme, they also completely failed to oversee the operations of Vanda, thereby disabling them from being informed of the years' violations. Therefore, Defendants Watkins and Dugan face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

155.    Defendants Cola and Dugan are also conflicted from considering demand because they each face substantial likelihood of liability because of their participation in and obligations arising from being Chairman and member on the Audit Committee.  Defendants Cola and Dugan served on the Board and the Audit Committee at all relevant times. As set forth above, the Audit Committee's charter imposes specific duties on members of this committee to ensure compliance with laws, regulations and internal policies.  As members of the Audit Committee, they allowed or permitted false and misleading

statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the deficiencies described above.

156. Moreover, prior to joining Vanda, Defendant Cola served as President of Shire plc's Specialty Pharmaceuticals business, which was subject to a qui tam action alleging violations of the False Claims Act for allegedly making false and unsupported claims related to Adderall XR, Vyvanse, Daytrana, and promoting off-label uses of its drugs Pentasa, and Lialda. As the one of the highest-level executives at Shire plc, Defendant Cola must have participated or at least had actual knowledge of the misconduct that happened in Shire plc. Despite his dubious past at Shire plc, Defendant Cola again breached his fiduciary duty by deliberately or recklessly disregarding the red flags of off-label marketing and violations of relevant laws and regulations happened in Vanda. Moreover, it appears that Defendant Cola and Defendant Riverberi, due to their positions at Shire prior to joining Vanda, had had close personal relationship.

157. Therefore, Defendants Cola and Dugan face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

158. At the time this litigation was commenced, four of the five directors of the Board face a substantial likelihood of personal liability because they each served on the Board during the relevant time and deliberately disregarded red flags of off-label marketing and violation of Federal False Claim Act, state false claim acts, the FDCA and federal securities laws. Each of the Director Defendants deliberately or recklessly disregarded the Company's misconduct since at least 2015, when Vanda started to build a fraudulent scheme to promote its drugs Fanapt and Hetlioz for off-label use.

159. As alleged herein and based on the duties imposed pursuant to the Company's Corporate Governance Guidelines, Code of Business Conduct and Ethics, Delaware law, the FDCA,

and federal securities laws, the Director Defendants were aware of indicators and warnings that necessarily informed them of the violations taking place within the Company.

160.    Given the duties placed on the Board, to the extent any of Defendants did not have actual knowledge of the repeated violations of the Federal False Claim Act, state false claim acts, the FDCA and federal securities laws taking place within Vanda, such lack of knowledge could only be the product of willful disregard or recklessness that constitutes bad faith breaches of their duties.

## X.    CAUSES OF ACTION

### Count I

### Against the Individual Defendants for Breach of Fiduciary Duty

161.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

162.    The Individual Defendants all owed and owe fiduciary duties to Vanda. By reason of their fiduciary relationships, Defendants specifically owed and owe Vanda the highest obligation of good faith and loyalty in the administration of the affairs of Vanda, including assuring that Vanda complied with state and federal laws and FDA regulations. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Vanda alleged herein.

163.    The Individual Defendants willfully ignored their obligations under state and federal laws and regulations, Vanda's internal controls and numerous warnings and government investigations and warning. Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

164.    The Individual Defendants consciously violated their corporate responsibilities by affirmatively and repeatedly declining to stop and prevent Vanda from failing to maintain effective

controls against promoting drugs for off-label use and defrauding government-funded healthcare programs.

165.     The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Vanda in a manner consistent with the duties imposed upon them by law.

166.     As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Vanda has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, the substantial penalties, fines, costs associated with defending the Qui Tam Lawsuit and the Securities Class Action, severe damage to the share price of the Company, sales suspension and expenses described herein.

167.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**Count II**

**Against the Individual Defendants for Gross Mismanagement**

168.     Plaintiff repeats and re-alleges each and every allegation above as if set forth fully herein.

169.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

170.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

171.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## Count III

### Against the Individual Defendants for Waste of Corporate Assets

172.    Plaintiff repeats and re-alleges each and every allegation above as if set forth fully herein.

173.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Vanda disclosure controls and procedures, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in this improper code of conduct, which was continuous, connected, and ongoing throughout the relevant period. It resulted in continuous, connected, and ongoing harm to the Company.

174.    As a result of the misconduct described above, the Individual Defendants have caused Vanda to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty; and incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions, including defend the Company and its officers against the Quit Tam Lawsuit and the Securities Class Action.

175.    As a direct and proximate result of these Individual Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

176.    Plaintiff, on behalf of Vanda, has no adequate remedy at law.

## Count IV

### Against the Individual Defendants for Unjust Enrichment

177.    Plaintiff repeats and re-alleges each and every allegation above as if set forth fully herein.

178.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Vanda. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Vanda.

179.    Individual Plaintiff, as a stockholder and representative of Vanda, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**Count V**

**Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

180.    Plaintiff repeats and re-alleges each and every allegation above as if set forth fully herein.

181.    During the Relevant Period, the Company made materially false and/or misleading statements, as well as omitted disclosure of material adverse facts about the Company's business, operations, and prospects. Specifically, the Company failed to disclose to investors that: (1) Vanda was engaged in a fraudulent scheme in which the Company promoted the off-label use of Fanapt and Hetlioz; (2) Vanda defrauded the government by abusing Medicare, Medicaid, and Tricare programs; (3) as a result of the scheme, Vanda faced a Qui Tam Lawsuit from the government; (4) Vanda's promotional materials for Fanapt and Hetlioz were false and misleading, garnering regulatory scrutiny from the FDA; and (5) as a result, Defendants' statements about Vanda's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

182.     Thus, the price of the Company's shares was artificially inflated due to the deception of Defendants.

183.     As such, the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

> (a)  employed devices, schemes, and artifices to defraud; and
>
> (b)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

184.     As a result of the Individual Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

**Count VI**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9**

185.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

186.     SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's Proxy violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information and failed to disclose that the Company has been participating in improper, misleading and fraudulent sales practices, which include: (1) promoting Fanapt and Hetlioz for off-label uses; (2) overstating

Fanapt's efficacy to providers; (3) making false and misleading statements regarding Fanapt's safety warnings; (4) misleading providers about Fanapt's approved dosing schedule; (5) improperly providing titration packets which did not have adequate instructions for use; (6) promoting Fanapt as a first line therapy; (7) fraudulently receiving drug reimbursements from the government by abusing Medicare, Medicaid, and Tricare programs as a result of the scheme, Vanda faced a Qui Tam Lawsuit from the government; (8) Vanda's promotional materials for Fanapt and Hetlioz were false and misleading, garnering regulatory scrutiny from the FDA; and (9) as a result, Defendants' statements about Vanda's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

187.   In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the Proxy were materially false and misleading.

188.   The misrepresentations and omissions in the Proxy were material to Company stockholders in voting on the matters set forth for stockholder ratification in the Proxy.  The Proxy was an essential link in the accomplishment of the continuation of these Defendants' continued violation of their fiduciary duties.

189.   The Company was damaged as a result of these Individual Defendants' material misrepresentations and omissions in the Proxy.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   A judgment against all Defendants for the amount of damages sustained by the Company as a result of Defendants' wrongdoing as alleged herein;

B.   Directing Vanda to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Vanda and its

shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

      a.   a proposal to strengthen Vanda's oversight of its disclosure procedures;

      b.   a proposal to strengthen the Company's controls over financial reporting;

      c.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

      d.   a proposal to permit the shareholders of Vanda to nominate at least two candidates for election to the Board.

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and the state statutory provisions sued hereunder, including attaching, impounding, and imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Vanda has an effective remedy;

D.     Awarding to Vanda restitution from Defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.     Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.     A grant of such other, further relief, whether similar or different, including damages, as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  July 25, 2019                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Gregory Mark Nespole_____*
Gregory Mark Nespole (GN 6820)
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel:  (212) 363-7500
Fax:  (212) 363-7171
Gnespole@zlk.com

*Attorney for Plaintiff*

**VERIFICATION**

I, Samuel Williams, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

Print Name: Samuel Williams                    Date: 07/22/2019

IP: 99.203.74.144